UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RA INVESTMENTS I, LLC, ET AL.,     )
                                 )
        Plaintiffs,        )
                                 )      CIVIL ACTION NO.
VS.                             )
                                 )      3:04-CV-1565-G
DEUTSCHE BANK AG, ET AL.,      )
                                 )
        Defendants.     )

## MEMORANDUM OPINION AND ORDER

Before the court are the motions of (1) Lincoln Financial Advisors, David
Rhodes, Cyndy Montgomery, and Reagan Lorenzen (the "Lincoln defendants");
(2) Klein & Pollack, L.L.P. and Alan C. Klein (the "Klein defendants"); (3) Holly C.
Roundtree, d/b/a Holly Roundtree, C.P.A. ("Roundtree"); (4) John G. Robinson
("Robinson"); (5) Smith & Frank Group Services, Inc., Randy Smith, and Chris Fay
(the "Smith Frank defendants"); (6) Garza & Staples, P.C. and Joe B. Garza (the
"Garza defendants"); and (7) Deutsche Bank AG, Deutsche Bank Securities, Inc.,
d/b/a Deutsche Bank Alex. Brown, Craig Brubaker, David Parse, and Todd
Clendening (the "Deutsche Bank defendants") (collectively, the "defendants") to

dismiss the plaintiffs' complaint.  For the reasons stated below, the defendants'

motions are granted.

## I. BACKGROUND

This case arises from an income tax avoidance strategy ("the COBRA

Strategy") which the defendants,[1] allegedly acting in concert, marketed and sold to

the plaintiffs.  According to the plaintiffs, the Deutsche Bank defendants not only

designed and sold the COBRA Strategy, but also directly marketed and promoted it

to the plaintiffs.  Plaintiffs' First Amended Complaint ("Complaint") ¶ 52.  The

plaintiffs allege that a law firm, Jenkens & Gilchrist, P.C. ("Jenkens"), and the

Deutsche Bank defendants recruited the other defendants as marketing participants

to assist in marketing the COBRA[2] Strategy to wealthy clients.  *Id.* ¶ 67.  The

plaintiffs aver that they agreed to engage in the COBRA Strategy based on the

---

[1]      Any reference to the "defendants" excludes the following parties:
(1) BDO Seidman LLP, Robert Dudzinsky, and Neil Rosenbaum (the "BDO
defendants"); (2) KMPG, LLP and Michael Moore (the "KPMG defendants"), and
(3) Nelson & Company, P.C. f/k/a Nelson, Fink, & Company, P.C., and Darlene Fink
(the "Fink defendants").  The BDO defendants filed a motion to compel arbitration
on October 15, 2004 and that motion is currently pending before the court.  *See
generally* The BDO Defendants' Motion to Compel Arbitration and Brief in Support
Thereof.  The KPMG defendants and Fink defendants have been voluntarily
dismissed from the action.  *See generally* Plaintiffs' Notice of Voluntary Dismissal with
Prejudice as to Defendants KPMG, LLP and Mike Moore (filed April 5, 2005); Letter
to Court Regarding Settlement Agreement Between the Overturf plaintiffs and the
Fink defendants (filed Feb. 8, 2005).

[2]      COBRA is an acronym for Currency Options Bring Reward Alternatives.
Plaintiffs' First Amended Complaint ¶ 52.

defendants' representations regarding the likelihood of payout from the strategy, its legality, and the improbability of challenges by the Internal Revenue Service ("IRS"). *Id*. ¶¶ 70, 74-75.

The plaintiffs assert claims for damages resulting from "tax strategies involving certain foreign exchange digital option contracts" which the complaint refers to as "FX Contracts" or "COBRA." *Id*. ¶¶ 47, 52. The plan to develop and market the FX Contracts was developed primarily by the Deutsche Bank defendants and Jenkens[3] in the mid-to-late 1990s. *Id*. ¶¶ 47-48.

The COBRA Strategy was marketed as a tax shelter and operated as follows. First, the taxpayer sold a short option and purchased a long option, with different strike prices, in almost identical amounts on a foreign currency exchange, both options to expire in thirty days.[4] *Id*. ¶ 136. Second, the taxpayer contributed his or her options to a general partnership formed for the purpose of conducting the

---

[3]     Jenkens is not a named defendant because of the pendency of a proposed class action settlement in the Southern District of New York. Complaint ¶ 52 n.7. See *Denney, et al. v. Jenkens & Gilchrist, et al.*, No. 03-CV-5460 (SAS) (S.D. N.Y.), 2004 WL 1197251 (S.D.N.Y. May 19, 2004).

[4]     On all of the FX contracts, the "trigger" (*i.e.*, the event which caused the payoff) occurred when the spot rate on the underlying currency pair was at or below a specific spot rate on a certain date at a certain time. Complaint ¶ 50. According to the terms of the FX contracts, Deutsche Bank was authorized to use discretion in selecting the spot rate on expiration and to determine when and if the event was triggered. *Id*. ¶ 51. The range of spot rates available to Deutsche Bank was larger than, and included, the range of "winning" spot rates as defined in the FX contract. *Id*. Deutsche Bank acted as the "calculation agent" and could choose to either accept or disregard any spot rate. *Id*.

COBRA transaction.  *Id*.  After thirty days, the options expired, resulting in either a gain or a loss.  *Id*.  Third, the taxpayer made a capital contribution, consisting of cash or other capital assets, to the partnership.  *Id*.  Fourth, the taxpayer contributed his or her interest in the partnership to an S Corporation formed for this purpose, causing the termination of the partnership.  *Id*.  Finally, the S Corporation sold the capital assets contributed by the taxpayer.  *Id*.  Since the basis of the taxpayer's interest in the partnership was increased by the purchase cost of the long options, but not decreased by the premium earned on the sale of the short options, upon the contribution of the partnership interests to the S Corporation and the sale by the S Corporation of its capital assets, the S Corporation realized a large loss that purportedly reduced the taxpayer's liability.  See *id*. ¶¶ 136-43.

The Deutsche Bank defendants allegedly recruited the other defendants to assist them in locating wealthy clients and marketing the COBRA Strategy to them. *Id*. ¶¶ 67-68.  BDO Seidman developed a written strategy, called the BDO Wolfpack Manual, on how to sell the COBRA Strategy.  See *id*. ¶¶ 69-73.  The investors were told that a major law firm, Jenkens, would prepare an independent opinion letter confirming that the COBRA Strategy was legal and providing the investors with "insurance" in the event of an IRS audit.  *Id*. ¶¶ 74-75.

On December 27, 1999, the IRS issued Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property."  *Id*. ¶ 195.  In this notice,

- 4 -

the IRS indicated that "certain types of transactions" were "being marketed to

taxpayers for the purpose of generating tax losses" that involved the taxpayers

claiming tax losses for capital outlays they had in fact recovered.  *Id*.  The IRS gave

notice that it would not recognize artificial losses.  *Id*.  The plaintiffs allege that the

defendants informed the plaintiffs who had entered the COBRA Strategy in 1999

that this IRS notice did not affect their participation in the strategy.  *Id.* ¶¶ 195-96.

Nevertheless, the plaintiffs contend that as a result of Notice 1999-59, the

defendants knew or should have known that the IRS would not recognize the

purported losses arising from the COBRA Strategy.  See *id*. ¶ 196.

    In August 2000, the IRS issued another notice, Notice 2000-44, entitled "Tax

Avoidance Using Artificially High Basis."  *Id*. ¶ 197.  This notice referred to Notice

1999-59 and described the transactions marketed to the plaintiffs by the defendants.

*Id*.  The IRS stated that the "purported losses from these transactions (and from any

similar arrangements designed to produce non-economic tax losses by artificially

overstating basis in partnership interest) are not allowable as deductions for Federal

income tax purposes."  *Id*. ¶ 198.  The defendants failed, however, to retract, modify

or qualify their tax and other advice to the plaintiffs, or the opinions expressed in the

Jenkens opinion letters.  *Id*. ¶ 199.  In fact, the defendants continued to represent

that the COBRA Strategy was a legal tax shelter, and that the plaintiffs were not

required to disclose or register the COBRA transactions on their federal tax returns.

*Id*. ¶ 200.  The defendants continued to promote the COBRA Strategy after Notice 2000-44 was issued, even though the BDO defendants had internally concluded that the notice raised serious concerns.  *Id*. ¶ 202.

In 2000 and early 2001, Jenkens sent the plaintiffs[5] virtually identical opinion letters about the propriety of the COBRA Strategy.  *Id*. ¶¶ 204-06.  The opinion letters reassured the plaintiffs that entering into the options would not create problems with the IRS.  *Id*. ¶ 206.  Although some of the opinion letters mentioned Notice 2000-44, these letters stated that it would have "no substantive effect on the Transaction into which you entered" and "is *prima facie* inapplicable to your situation."  *Id*.  The plaintiffs allege that the defendants were aware of the existence and effect of Notices 1999-59 and 2000-44, but intentionally failed to fully mention or discuss the effect of the notices on the COBRA Strategy.  *Id*.

In late 2001, the IRS offered a Tax Amnesty Program ("Amnesty Program"), a voluntary disclosure program for taxpayers.  *Id*. ¶ 216.  Under the Amnesty Program, taxpayers who disclosed their involvement in strategies like COBRA would avoid liability for penalties for underpayment of taxes without conceding liability for back

---

[5]      The Davis plaintiffs and Overturf plaintiffs were the only ones who did not receive an opinion letter from Jenkens.  *Id*. ¶ 204.  Although the Davis plaintiffs engaged in the COBRA Strategy, they decided not to claim the generated losses on their 2001 tax return after reading published reports that questioned the Strategy.  *Id*. ¶ 204 n.33.  Additionally, the Overturf plaintiffs' opinion letter was prepared by the Garza defendants.  *Id*. ¶¶ 204 n.34, 207.  Nevertheless, the conclusions reached in the Garza defendants' opinion letter were virtually identical to those reached in the Jenkens' opinion letters.  *Id*. ¶ 207.

taxes or interest.  *Id*.  The plaintiffs allege that even though each defendant knew of the Amnesty Program and its applicability to the plaintiffs, they either failed to inform plaintiffs of the program -- thereby depriving the plaintiffs of the opportunity to join the Amnesty Program and avoid the assessment of penalties -- or advised them not to take advantage of it.  *Id*.  As a result, none of the plaintiffs participated in the Amnesty Program.  *Id*.  In June 2003, the IRS issued new regulations retroactive to October 18, 1999. *Id*. ¶ 227.  Because the regulations were retroactive, they invalidated the COBRA Strategy that the plaintiffs had used.  *Id*. ¶ 228.  The plaintiffs were subsequently audited by the IRS for the tax returns on which they claimed losses resulting from the COBRA Strategy.

The plaintiffs contend that in addition to back taxes, interest, and penalties, they have paid substantial amounts of money in fees to the defendants and to retain new tax and legal advisors.  See *id*. ¶¶ 217, 233-34.  They allege that the defendants also caused the plaintiffs to forgo other legitimate tax saving opportunities.  *Id*. ¶ 217. The plaintiffs allege that the FX contracts and the COBRA Strategy constituted a scheme to defraud them.  Specifically, the plaintiffs claim that the defendants failed to disclose:  (1) the true likelihood that the FX contracts would pay out; (2) that the Deutsche Bank defendants had virtually unlimited discretion to determine whether the FX contracts would pay out and therefore could ensure that they did not; (3) that the FX contracts had no reasonable possibility of a profit (at least not in excess of the

fees paid) and that, in reality, the net effect of the options they were purchasing and selling was no more than a wager on where the price of the underlying currency would be at a certain time on a given date; and (4) that COBRA, on which Jenkens provided "independent" legal advice, was in fact a strategy devised by Jenkens. *Id*. ¶¶ 56, 259.

As a result of participating in the illegal tax strategy, the plaintiffs incurred significant penalties and interest to the IRS along with having to pay back taxes, and additional legal and accounting advisory fees. *Id*. ¶ 352. On July 19, 2004, the plaintiffs commenced this case alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., breach of contract, unjust enrichment, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, negligent misrepresentation, malpractice, and civil conspiracy. *See generally* Plaintiffs' Original Complaint ("Original Complaint"). The defendants now move to dismiss the complaint against them in its entirety pursuant to FED. R. CIV. P. 12(b)(6).

## II. ANALYSIS

### A. Standard for Dismissal Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). There are two primary principles that guide the court's determination of whether dismissal under Rule 12(b)(6) should be granted. First, a motion under Rule

12(b)(6) should be granted only if it appears beyond doubt that the nonmovants could prove no set of facts in support of their claims that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Leffall v. Dallas Independent School District*, 28 F.3d 521, 524 (5th Cir. 1994); see also *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1357 at 598 (1969), for the proposition that "the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted"), *cert. denied*, 459 U.S. 1105 (1983). Second, the court must accept all well-pleaded facts as true and view them in the light most favorable to the nonmovants. See *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.*, 30 F.3d 627, 629 (5th Cir. 1994); *Norman v. Apache Corporation*, 19 F.3d 1017, 1021 (5th Cir. 1994); *Chrissy F. by Medley v. Mississippi Department of Public Welfare*, 925 F.2d 844, 846 (5th Cir. 1991). However, conclusory allegations and unwarranted factual deductions will not suffice to prevent a motion to dismiss. *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

B.  <u>The Plaintiffs' RICO Claims</u>

The RICO Act provides civil and criminal liability for individuals engaged in "a pattern of racketeering activity."  18 U.S.C. § 1962(a)-(d).  Persons injured in their business or property from a RICO violation have a private cause of action under the act.  *See* 18 U.S.C. § 1964(c).  To demonstrate a "pattern" of racketeering activity, a plaintiff must show at least two predicate acts of racketeering activity occurring within a ten year period.  18 U.S.C. § 1961(5).  "Racketeering activity" includes acts that are indictable under state or federal law, including mail fraud and wire fraud.  18 U.S.C. § 1961(1).

The defendants first move to dismiss the plaintiffs' claims under 18 U.S.C. §§ 1962(c)[6] and (d)[7] on the grounds that the complaint fails to sufficiently allege such

---

[6]    Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

[7]    Section 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection

(continued...)

- 10 -

claims and that the claims are barred by Section 107 of the Private Securities

Litigation Reform Act ("PSLRA"), which amended 18 U.S.C. § 1964(c).

Section 1964(c), as amended by Section 107 of the Private Securities

Litigation Reform Act, states:

> Any person injured in his business or property by reason of
> a violation of section 1962 of this chapter may sue therefor
> in any appropriate United States district court and shall
> recover threefold the damages he sustains and the cost of
> the suit, including a reasonable attorney's fee, *except that no
> person may rely upon any conduct that would have been actionable
> as fraud in the purchase or sale of securities to establish a violation
> of section 1962. The exception contained in the preceding sentence
> does not apply to an action against any person that is criminally
> convicted in connection with the fraud, in which case the statute of
> limitations shall start to run on the date on which the conviction
> becomes final.*

18 U.S.C. 1964(c) (emphasis added).

The PSLRA amended the RICO Act by providing that a civil RICO claimant

may not "rely upon any conduct that would have been actionable as fraud in the

purchase or sale of securities to establish a violation of section 1962" unless the

person who committed said fraudulent conduct has been criminally convicted.[8] 18

---

[7](...continued)
> (a), (b), or (c) of this section.

18 U.S.C. § 1962(d).

[8]     The plaintiffs acknowledge they "are not aware of any criminal
convictions to date related to Defendants' commission of . . . predicate acts."
Plaintiffs' RICO Statement (November 29, 2004). It is "well-established in this
(continued...)

- 11 -

U.S.C. § 1964(c).  The PSLRA "was intended by Congress to eliminate securities

fraud as a predicate offense in a civil RICO action and to bar a plaintiff from

plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under

civil RICO if such offenses are based on conduct that would have been actionable as

securities fraud." *In re Enron Corporation Securities, Derivative & ERISA Litigation*, 284

F. Supp. 2d 511, 618 (S.D. Tex. 2003) (internal quotation marks and citations

omitted).  The PSLRA's focus was on eliminating the "so-called 'treble damage

blunderbuss of RICO' in securities fraud cases." *Id*. at 619 (quoting *Matthews v.

Kidder, Peabody & Company, Inc.*, 161 F.3d 156, 157 (3d Cir. 1998), *cert. denied*, 526

U.S. 1067 (1999)).  In determining whether the alleged predicate acts are barred by

this section of the PSLRA, courts should properly focus their analysis on whether the

conduct pleaded as the predicate offense is "actionable" as securities fraud -- not on

whether the conduct is "intrinsically connected to, and dependent upon conduct

which would be actionable under Federal securities law." *Bald Eagle Area School

District v. Keystone Financial, Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (internal

quotation marks omitted).

---

[8](...continued)
circuit" that a district court may consider a RICO case statement in deciding a
dispositive motion.  *Marriott Brothers v. Gage*, 911 F.2d 1105, 1107 (5th Cir. 1990)
(motion for summary judgment); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 605,
608 (5th Cir. 1998) (motion to dismiss); *Word of Faith World Outreach Center Church,
Inc. v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996) (motion to dismiss), *cert. denied*, 520
U.S. 1117 (1997).

Accordingly, if the racketeering activity alleged to support a RICO claim is

characterized by the plaintiffs as wire, mail, or bank fraud, but it also amounts to

securities fraud, the claim must be dismissed. *Enron*, 284 F. Supp. 2d at 619. "[T]he

court should not permit a 'surgical presentation' of the cause of action to 'undermine

the congressional intent behind the RICO Amendment [effected by the PSLRA]'" *Id*.

(quoting *Bald Eagle*, 189 F.3d at 329-30)).  In this case, the plaintiffs contend that

"[a]t the center of the fraudulent scheme are transactions known as FX Contracts --

digital options on foreign currency."  Plaintiffs' Consolidated Response in Opposition

to Defendants' Motions to Dismiss Plaintiffs' Original Complaint ("Plaintiffs'

Consolidated Response") at 9.  The threshold question in this case, therefore, is

whether the digital option contracts involved in the COBRA Strategy are securities.[9]

---

[9]     Every defendant argues that the PSLRA bars the plaintiffs' RICO claims
in this case because the digital option contracts are securities.  *See* Lincoln Financial
Advisors, David Rhodes, Cyndy Montgomery, and Reagan Lorenzen's Brief in
Support of Their Motion to Dismiss ("Lincoln Defendants' Motion to Dismiss") at 7-
8; Lincoln Financial Advisors, David Rhodes, Cyndy Montgomery, and Reagan
Lorenzen's Reply Brief in Support of Their Motion to Dismiss ("Lincoln Defendants'
Reply Brief") at 4-5; Klein Defendants' Memorandum of Law in Support of Motion
to Dismiss Plaintiffs' Original Complaint ("Klein Defendants' Motion to Dismiss") at
3; Klein Defendants' Reply to Plaintiffs' Consolidated Response in Opposition to
Defendants' Motions to Dismiss Plaintiffs' Original Complaint ("Klein Defendants'
Reply Brief") at 4-5; Defendant Holly C. Roundtree's Memorandum of Law in
Support of Motion to Dismiss Original Complaint ("Roundtree's Motion to
Dismiss") at 4; Smith & Frank Defendants' Memorandum of Law in Support of
Their Motion to Dismiss Plaintiffs' Original Complaint ("Smith Frank Defendants'
Motion to Dismiss") at 8-10; Smith & Frank Defendants' Reply in Support of Their
Motion to Dismiss ("Smith Frank Defendants' Reply") at 2-3; Defendant John G.
Robinson's Motion to Dismiss ("Robinson's Motion to Dismiss") at 2; Garza &
                                                                (continued...)

*See* Plaintiffs' Response in Opposition to the Deutsche Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Plaintiffs' Response to the Deutsche Bank Defendants") at 2-3.

---

[9](...continued)

Staples, P.C. and Joe B. Garza's Memorandum of Law in Support of Motion to Dismiss or, Alternatively, Motion for a More Definite Statement ("Garza Defendants' Motion to Dismiss") at 3-4; Deutsche Bank Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint ("Deutsche Bank Defendants' Motion to Dismiss") at 4-5; Deutsche Bank Defendants' Reply in Response to Plaintiffs' Opposition to Deutsche Bank Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Deutsche Bank Defendants' Reply Brief") at 2-3.

The plaintiffs, on the other hand, argue that the digital option contracts involved in the COBRA Strategy are not securities. *See generally* Plaintiffs' Consolidated Response at 9-12; Plaintiffs' Response to the Deutsche Bank Defendants at 2-3. Although the plaintiffs correctly note that the court in *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363 (S.D. N.Y. 2004), *amended by* 2004 WL 2403911 (S.D. N.Y. Oct. 26, 2004), never addressed the issue of whether digital option contracts are securities, *see* Plaintiffs' Consolidated Response at 10-11, *Seippel* clearly stated that this issue was not before the court. 341 F. Supp. 2d at 372. The plaintiffs cannot plausibly maintain, therefore, that *Seippel* stands for the proposition that the COBRA Strategy does not involve securities. The plaintiffs' reliance on *Seippel* to support their position that digital option contracts are not securities is unavailing.

Additionally, the plaintiffs urge the court to consider the recent decision in *Heller v. Deutsche Bank AG*, No. Civ. A. 04-CV-3571, 2005 WL 525401, at *4 (E.D. Pa. Mar. 3, 2005). This case, however, is also inapplicable because the court specifically noted that the defendants did not assert that the digital option contracts constituted securities or that the COBRA Strategy constituted a security transaction. See *id.*

- 14 -

1. *Are The Digital Option Contracts Securities?*

The plaintiffs allege that they were deceived into purchasing foreign exchange digital option contracts or FX Contracts.  Complaint ¶ 54.  Specifically, the plaintiffs allege:

> [T]he FX Contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants . . .  [N]either party had any rights to take possession of the "underlying currency."  As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a "bet") based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties.

Complaint ¶ 50 n.4; see also *id*. ¶¶ 44, 56, 151; Plaintiffs' Consolidated Response at 10; Plaintiffs' Response to the Deutsche Bank Defendants at 2-3.

The Securities Act of 1933 and the Securities Exchange Act of 1934 include "investment contract[s]" within the definition of a "security" subject to the Acts.  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).[10]  An investment contract, for purposes of the

---

[10]      "The term 'security' means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, *any put, call, straddle, option, or privilege on any security*, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the
(continued...)

- 15 -

Securities Acts, is a contract, transaction or scheme which "involves [1] an investment of money in [2] a common enterprise [3] with profits to come solely from the efforts of others." *Long v. Shultz Cattle Company, Inc.*, 881 F.2d 129, 132 (5th Cir. 1989) (quoting *Securities and Exchange Commission v. W.J. Howey Company*, 328 U.S. 293, 301 (1946)). "This definition embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Securities and Exchange Commission v. Edwards*, 540 U.S. 389, 393 (2004) (internal quotation marks and citation omitted).

There is no dispute in this case that there was an investment of money. Complaint ¶¶ 80 ("Based on the representations and assurances of Robinson, Mayer, and the Deutsche [Bank] Defendants, the Davis Plaintiffs agreed to engage in the

---

[10](...continued)
foregoing."  15 U.S.C. § 77b(a)(1) (emphasis added).

"The term 'security' means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, *any put, call, straddle, option, or privilege on any security*, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing."  15 U.S.C. § 78c(a)(10).

COBRA Strategy."), 83-84 (describing the meeting Anderson had with Roundtree, Mayer, and Brubaker at which Brubaker explained that the foreign currency options had a "'chance of making a great return on the investment and a good chance of making a reasonable return.'"), 90 ("Lorenzen and Mayer also began an aggressive push to get the Griffiths to sell as much stock as they could because the Strategy might not be available in later years 'due to possible law changes.'  Lorenzen told the Griffiths that they could not do the transaction for less than a $5 million income offset."), 93 ("The Griffiths were repeatedly told that the Strategy was legal and that there was even a good chance that the Griffiths could double their money on the investment itself."); 96 (stating that Klein, Mayer, and Brubaker told the Rose Plaintiffs that "not only could the Strategy reduce their tax liability, but there was also a good chance that they could 'double their money.'"), 101 ("Brubaker discussed the Strategy in great detail.  Brubaker stated that the Kopf Plaintiffs had a 50% chance to profit greatly from the actual COBRA investment."), 103 ("Based on the representations and assurances of Mayer, Brubaker, and the Smith Frank Defendants, the Kopf Plaintiffs agreed to engage in the COBRA strategy"), 104 (describing how Smith introduced Seals to the COBRA strategy and "told him that it was a legal, legitimate tax-savings measure"), 107 (during a meeting between Avneri, Mayer, and Brubaker, "Brubaker touted the COBRA Strategy as a completely legal tax strategy that also offered the opportunity to make a substantial profit on the investment part

of the transaction"), 108 ("Brubaker told Mr. Avneri that, aside from the tax benefits

of the COBRA investment, it was a legitimate opportunity to 'double your money.'"),

111 (Lee "aggressively promoted the COBRA Strategy, telling Mr. Dusansky that

there was a chance for him to make a substantial profit on the COBRA investments,

but in any event, the tax advantages would be 'very significant'"), 116 ("During these

telephone conversations, Brubaker discussed both the tax-savings and investment

aspects of the COBRA Strategy in depth.  Brubaker reiterated that the COBRA

Strategy was a legitimate tax-savings strategy, as well as a realistic opportunity of

making a hefty profit"), 119 ("To close the deal, the Defendants brought Brubaker in

to once again assure Mr. Jacoby of not only the validity of the tax-savings aspect of

the Strategy, but also of the opportunity to make a significant profit on the

investment aspect of the Strategy"), 126 ("Brubaker and Clendening also told Mr.

Luscomb that, in addition to the tax benefits of the Strategy, he also had a chance to

make a substantial profit on the investment component of the COBRA Strategy.

Based on the repeated assurances and representations of Montgomery, Rhodes,

Brubaker, Clendening, and Mayer, Luscomb decided to engage in the COBRA

Strategy"), 129 ("During this meeting Brubaker and Garza discussed the COBRA

Strategy in more detail and, most importantly, Garza and Brubaker both convincingly

assured and reiterated to Mr. Overturf that the COBRA Strategy was a legitimate and

legal tax-savings strategy and, further, that the Overturf Plaintiffs had an opportunity

to make a significant profit from the COBRA investments . . . .  The fact that

Deutsche Bank and Garza were willing to put their reputations behind the Strategy

played a major role in the Overturf Plaintiffs' decision to engage in the Strategy").

Accordingly, the court will proceed to decide whether the digital option contracts

constituted a common enterprise, and whether the plaintiffs were to receive profits

solely from the efforts of others.[11]

### a.  *The Common Enterprise*

There is a circuit split over the proof required to establish the existence of a

common enterprise.  The Third, Sixth, and Seventh Circuits require "horizontal

commonality" to satisfy the common enterprise requirement.  See, *e.g.*, *Salcer v.*

*Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 682 F.2d 459, 460 (3d Cir. 1982); *Hart v.*

---

[11]     The plaintiffs argue that the facts of this case are distinguishable from those in *Seippel*; *Jacoboni v. KPMG, LLP*, 314 F. Supp. 2d 1172 (M.D. Fla. 2004); and *Loftin v. KMPG, LLP*, No. 02-81166-Civ, 2003 WL 22225621, at *1 (S.D. Fla. Sept. 10, 2003), because this case involves digital option contracts, which are outside the definition of a security.  Plaintiffs' Consolidated Response at 9-11; Plaintiffs' Response to the Deutsche Bank Defendants at 2-3.  The plaintiffs rely on the language in *Seippel* where the court noted that digital option contracts were "significantly different" from the strategies used in the *Jacoboni* and *Loftin* cases. *Seippel*, 341 F. Supp. 2d at 372 n.58; *see also* Plaintiffs' Consolidated Response at 10-11.  The plaintiffs' reliance on this language, however, is misplaced.  See *King v. Deutsche Bank AG*, No. CV-04-1029-HU, 2005 WL 611954, at *19-20 (D. Or. Mar. 8, 2005).  The *Seippel* case involved the same exact digital option transactions that were used in this case, and the court concluded that the plaintiffs' RICO claims were precluded by the PSLRA.  See *Seippel*, 341 F. Supp. 2d at 374 n.68.  The *Jacoboni* and *Loftin* cases involved tax shelter strategies different from the COBRA Strategy at issue here.  In fact, they did not even involve options of any kind, but shares of stock.  See *Jacoboni*, 314 F. Supp. 2d at 1174-75; *Loftin*, 2003 WL 22225621, at *1-2.

*Pulte Homes of Michigan Corporation*, 735 F.2d 1001, 1004 (6th Cir. 1984); *Milnarik v.
M-S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir.), *cert. denied*, 409 U.S. 887 (1972).
Horizontal commonality exists where investors share profits and losses, usually on a
pro rata basis.[12]  *Long*, 881 F.2d at 140.  The Fifth, Ninth, and Eleventh Circuits, by
contrast, reject horizontal commonality as a prerequisite and focus instead on the
"vertical commonality" between the investor and the investment promoter.  See, *e.g.*,
*Securities and Exchange Commission v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79
(5th Cir. 1974); *Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc.*,
474 F.2d 476, 482 n.7 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973); *Villeneuve v.
Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983).  Vertical
commonality exists where the investors' fortunes are interwoven with and dependent
upon the efforts and success of the investment promoter or of third parties.  *Koscot*,
497 F.2d at 478; see also *Long*, 881 F.2d at 140-41 (stating that the critical inquiry is
whether the fortuity of the investments is dependent upon promoter expertise).

 The Lincoln defendants assert that the digital option contracts represented a
common enterprise because the plaintiffs "had no control over the exercise of their
options, [and] were not given any input as to the type of foreign currency used or the
amount invested into each option."  Lincoln Defendants' Motion to Dismiss at 8.

---

  [12]  Horizontal commonality does not exist in this case.  The plaintiffs'
assets were not pooled, and all gains and losses resulting from their transactions were
attributed solely to their respective individual accounts.

The court agrees that the digital option contracts constituted a common enterprise. The plaintiffs' fortunes were intertwined with the defendants' success in executing the FX transactions.  Complaint ¶¶ 50-51 ("On all of the FX Contracts, the trigger occurred when the spot rate on the underlying currency pair . . . was at or below a specific spot rate *on a certain date at a certain time*. . . .  Deutsche Bank, as the 'calculation agent,' could choose to accept or disregard any spot rate.") (emphasis in original).  There is also no question that the plaintiffs relied on the defendants' expertise for the success of the transactions.  *Id*. ¶¶ 51 ("To further ensure control of the transaction . . ., the ability to determine when and if the event was triggered was retained by Deutsche Bank . . . ."); 68 ("Why did Jenkens and the Deutsche Defendants recruit the other Defendants to sell the Strategy?  . . .  Defendants knew that if these firms recommended the tax shelter to their wealthy clients, the clients would more than likely do the deal without questioning the details of the strategy."); 144 ("[T]he Dusansky Plaintiffs agreed to engage in the COBRA Strategy.  Their decision was based in large measure upon the Defendants' advice, the promised 'independent' opinion letter of Jenkens confirming the propriety of the COBRA Strategy, and the representations and recommendations of the Defendants during the initial COBRA Strategy presentation and thereafter."); 147 (stating that the Duetsche Defendants "advised and instructed the Dusansky Plaintiffs to pick the Euro as the foreign currency and the exact amounts to be invested in each option" and that the

"Dusansky Plaintiffs did as they were told."); 157 (same with respect to the Anderson Plaintiffs); 160 (same with respect to the Avneri plaintiffs); 162 (same with respect to the Griffith plaintiffs); 166 (same with respect to the Jacoby plaintiffs); 169 (same with respect to the Kopf plaintiffs); 171 (same with respect to the Luscomb plaintiffs); 177 ("[T]he Overturf Plaintiffs agreed to engage in the COBRA Strategy. Their decision was based in large measure upon the Defendants' advice, the promised 'independent' opinion letter of Garza & Staples confirming the propriety of the COBRA Strategy, and the representations and recommendations of the Defendants during the initial COBRA Strategy presentation and thereafter."); 180 ("[T]he Wilson Plaintiffs agreed to engage in the COBRA Strategy.  Their decision was based in large measure upon the Defendants' advice, the promised 'independent' opinion letter of Jenkens confirming the propriety of the COBRA Strategy, and the representations and recommendations of the Defendants during the initial COBRA Strategy presentation and thereafter."); 183 (same with respect to the Seals plaintiffs); 186 (same with respect to the Rose plaintiffs); 189 (same with respect to the Davis plaintiffs); see also *id*. ¶¶ 204 ("Jenkens sent the Plaintiffs (except for the Davis Plaintiffs and the Overturf Plaintiffs) virtually identical opinion letters, regarding the propriety of the COBRA Strategy (the 'Opinion Letters')."); 205-06 (detailing the contents of the opinion letter).  The court concludes that there was a

common enterprise, and now proceeds to determine whether profits were to be derived solely from the efforts of others.

b.  *Solely From the Efforts of Others*

The 1933 and 1934 Securities Acts are remedial in nature.  *Koscot*, 497 F.2d at 479.  "[I]n order to give effect to the remedial purposes of the Acts, substantive 'economic realities' must govern over form."  *Long*, 881 F.2d at 133.  Accordingly, the word "solely" in the third prong of the investment contract test should not be literally construed.  *Id.*  Literal construction would allow sophisticated counsel to draft agreements requiring a "modicum of effort" on the part of the investors in order to circumvent the Acts.  *Id.*  Instead, profits[13] are derived solely from the efforts of others if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir.), *cert. denied*, 454 U.S. 897 (1981)).

The Lincoln defendants assert that the digital option contracts satisfy the third prong of the investment contract test.  Similar to their common enterprise argument,

---

[13]     Tax avoidance strategies, similar to the one at issue in this case, can count as profits under this prong of the test.  See, *e.g.*, *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 172 (D. Conn. 2004) ("[A] transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.") (quoting *Gilman v. Commissioner of Internal Revenue*, 933 F.2d 143, 147 (2d Cir. 1991)).

they rely on the fact that the plaintiffs had no control over their options.[14]  Lincoln
Defendants' Motion to Dismiss at 8.  The plaintiffs, for their part, assert that the
digital option contracts do not satisfy the third prong because "any gain would likely
result in large part from market movements, not . . . due to [the promoter's] efforts."
Plaintiffs' Consolidated Response at 10 (quoting *Lehman Brothers Commercial
Corporation v. Minmetals International Non-Ferrous Metals Trading Company*, 179 F.
Supp. 2d 159, 164 (S.D. N.Y. 2001)) (alteration in original).  The plaintiffs'
argument is wide of the mark.  The proper focus in determining if profits are derived
solely from the efforts of another is on the allocation of control over the investment
transactions.  *Williamson*, 645 F.2d at 423-24 ("An investor who retains control over
his investment has not purchased an interest in a common venture premised on the
reasonable expectation of profits to be derived from the entrepreneurial or managerial
efforts of others . . . .") (internal quotation marks and citations omitted); see *Koscot*,
497 F.2d at 479-86 (analyzing whether the presence of slight investor effort is
inimical to the finding of an investment contract).  As detailed above, it is clear that
the defendants exercised control over the investments and that their efforts were, in
the language of *Long*, 881 F.2d at 133, "the undeniably significant ones."

    That "the Plaintiffs [themselves] purchased the FX Contracts," Complaint
¶ 57, does not preclude a finding that profits were to be derived through the efforts of

---

[14]    The Fifth Circuit recognizes that its standard for the second and third
prong of the "investment contract" test overlap significantly.  *Long*, 881 F.2d at 141.

others.  Where, as in this case, investor actions are predicated solely on the

promoter's advice and direction, the third prong of the investment contract definition

is satisfied.  *Long*, 881 F.2d at 134.  For the reasons stated above, the court concludes

that the plaintiffs' profits were to be derived solely from the efforts of others.  The

court further concludes that, all three prongs of the investment contract test having

been satisfied, the digital option contracts at issue are securities.[15]

2.  *Is the Conduct Underlying the Plaintiffs' RICO*
*Claims Actionable as Securities Fraud?*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly,
> by the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national
> securities exchange . . .
>
> > (b)  To use or employ, in connection with the
> > purchase or sale of any security registered on
> > a national securities exchange or any security
> > not so registered, . . . any manipulative or

---

[15]      The plaintiffs argue that the COBRA Strategy involved transactions "more akin to wagers or lotteries on the movements of foreign currency prices" than the physical exchange of securities.  Plaintiffs' Consolidated Response at 10.  They rely on *Lehman Brothers*, 179 F. Supp. 2d at 164, where the court held that digital transactions did not fall within either the foreign currency definition or the "investment contract" definition of "security" under New York's Martin Act.  Nevertheless, the court finds that the plaintiffs' argument is flawed.  Without question, the COBRA Strategy at issue here involved more than the digital option contracts.  As discussed hereafter, see *infra* note 17, it also involved the contribution of stock to the partnership and the subsequent sale of that stock.  Furthermore, the issue of the PSLRA's bar on RICO claims was not before the court in *Lehman Brothers*.

> deceptive device or contrivance in
> contravention of such rules and regulations as
> the [Securities and Exchange] Commission
> may prescribe as necessary or appropriate in
> the public interest or for the protection of
> investors.

15 U.S.C. § 78j(b).

In addition, the Securities and Exchange Commission ("SEC") Rule 10b-5

provides that:

> It shall be unlawful for any person, directly or indirectly,
> by the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
>
> > (a)  To employ any device, scheme, or artifice
> > to defraud,
> >
> > (b)  To make any untrue statement of a
> > material fact or to omit to state a material fact
> > necessary in order to make the statements
> > made, in light of the circumstances under
> > which they were made, not misleading, or
> >
> > (c)  To engage in any act, practice, or course
> > of business which operates or would operate
> > as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has explained that the phrase "in connection with" in

section 10(b) should "be construed 'not technically and restrictively, but flexibly to

effectuate [the statute's] remedial purposes.'" *Securities and Exchange Commission v.*

*Zanford*, 535 U.S. 813, 819 (2002) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)).  All that is necessary to satisfy that requirement is proof of "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide."  *Id.* at 825; see also *Superintendent of Insurance of State of New York v. Bankers Life and Casualty Company*, 404 U.S. 6, 12 (1971) ("Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under [the securities law] . . . .").[16]

Although the plaintiffs identify mail and wire fraud as the predicate acts supporting the RICO claim, these predicate acts are linked to numerous allegations of fraud in connection with the purchase or sale of securities that would be independently actionable under federal securities law.[17]  According to the complaint,

---

[16]       Under *Zanford*, all that is required for a section 10(b) violation is that the scheme to defraud and the sale of securities coincide.  In *Zanford*, the Court emphasized the broad scope of its ruling by providing examples of cases in which the fraud and the sale of securities would not coincide: where "after a lawful transaction had been consummated, a broker decided to steal the proceeds . . . [or] a case in which a thief simply invested the proceeds of a routine conversion in the stock market."  535 U.S. at 820.  The Court described those examples as cases in which the sale of securities and the fraud were "independent events."  *Id.*  Thus, where the fraud and the sale of securities are "less tangentially related," *i.e.*, more closely dependent on each other, the "in connection with" requirement is satisfied.  See *Jacoboni*, 314 F. Supp. 2d at 1179.

[17]       The defendants contend that the conduct relied on by the plaintiffs is actionable as securities fraud for the additional reason that the COBRA Strategy involved acquisition of shares in S Corporations, which are securities, as well as publicly traded stock.  According to the plaintiffs, they were induced to purchase and later sell shares of Lucent Technologies, and the digital option contracts, as part of

(continued...)

- 27 -

a key element of the COBRA Strategy was the purchase and sale of various securities to help generate the desired losses that could be used to offset the plaintiffs' capital gains or ordinary income.  Complaint ¶¶ 153 (alleging that Dusansky purchased shares of Lucent Technologies, Inc.), 157-94 (alleging that the transaction for each Plaintiff "was identical in form and differed only in the *size* of the various 'trades' and the type of currency involved" to the Dusansky transaction) (emphasis in original); see also *id*. ¶¶ 136 (explaining that the "S Corporation would sell the capital or

_____

[17](...continued)
the overall COBRA Strategy.  Complaint ¶¶ 138, 152-55.  The plaintiffs also allege that they formed an S Corporation "for the purpose of carrying out the COBRA strategy" and in the process acquired stock in that S Corporation.  Complaint ¶¶ 136, 139, 145, 158, 163, 165, 169, 172, 178, 181, 184, 187, 190.  Although the plaintiffs assert that the formation and capitalization of the S Corporation is "in no way a *purchase or sale of securities*," they fail to cite any legal authority to support this position.  Plaintiffs' Consolidated Response at 15 (emphasis in original).  Contrary to the plaintiffs' assertion, the shares in these corporations are considered securities. See, *e.g.*, *Landreth Timber Company v. Landreth*, 471 U.S. 681, 693-94 (1985) (stock in a closely held corporation is a security).  Further, the issuance of these shares to the plaintiffs as part of the COBRA Strategy constitutes a "sale" under the federal securities laws.  *Rekant v. Desser*, 425 F.2d 872, 877 (5th Cir. 1970); *Ruckle v. Roto American Corporation*, 339 F.2d 24, 27 (2d Cir. 1964).  As a result, the RICO claims are barred by the PSLRA for this reason as well.

The plaintiffs contend that whether or not the shares of Lucent Technologies are securities is "irrelevant" because some non-security might have been substituted for securities in the transactions to accomplish the desired basis-shifting on which the tax strategy depended.  *See* Plaintiffs' Consolidated Response at 11-12. Nevertheless, whether the sale or transfer of something else could have been substituted for Lucent Technologies is not the point.  These shares are at the heart of the alleged fraudulent scheme upon which the plaintiffs' RICO claims are premised. The fact remains that the plaintiffs' contributions were in the form of stock, and thus the artificial basis created by the series of options transactions was meant to and did in fact attach to that stock.

- 28 -

ordinary assets [including the securities] contributed by the Individual Plaintiffs. These assets would have an artificially inflated basis and their sale would lead to a substantial unrealized short-term capital loss and/or ordinary loss."), 78, 135, 139, 142, 143, 205 (discussing the alleged tax advice regarding losses generated through purchase and sale of securities as part of the COBRA Strategy and preparation of tax returns to reflect losses from the transactions).  Further, the plaintiffs claim that they were misled into entering the Strategy -- which relied upon the purchase and sale of securities to achieve the desired results -- by allegedly false and misleading statements about whether the plaintiffs would be able to take tax deductions for the capital and ordinary losses.  *Id*. ¶¶ 54, 56-58, 60, 74, 133-35, 141, 144, 151, 157, 160, 162, 165, 168, 171, 177, 180, 183, 186, 189, 204-07, 212-14.  Where, as here, the alleged fraud "coincides" with the purchase of securities, *Zanford*, 535 U.S. at 825, and the purchase of securities is "made to further [the defendants'] fraudulent scheme," *id.* at 820, the fraud is undeniably "in connection with the purchase or sale of any security" and actionable under Section 10(b) and Rule 10b-5.  *Id.* at 819.  Although the plaintiffs conclude that "[f]raud in the sale of securities is neither alleged nor claimed by Plaintiffs," Complaint ¶ 256; Plaintiffs' RICO Statement ("RICO Statement") at 5; *see also* Plaintiffs' Consolidated Response at 4, the court finds that this statement is irrelevant.  See, *e.g.*, *Whelan v. Winchester Production Company*, 319 F.3d 225, 230 (5th Cir. 2003) (holding that the plaintiff's conclusory RICO allegations were insufficient

to overcome the defendant's properly supported dispositive motion); *Amsterdam Tobacco Inc. v. Phillip Morris Inc.*, 107 F. Supp. 2d 210, 213 (S.D. N.Y. 2000) ("[T]he court is not required in a RICO case to accept as true 'conclusions of law or unwarranted deductions.'") (quoting *First Nationwide Bank v. Gelt Funding Corporation*, 27 F.3d 763, 771 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995)); *Willard*, 336 F.3d at 379 (same).

In the complaint, several of the plaintiffs allege that the defendants induced them to participate in the COBRA Strategy because they knew the plaintiffs expected to incur substantial capital gains from the sale of stock or the exercise of stock options. Although the plaintiffs characterized the false and misleading statements of the defendants as mail and wire fraud, those statements -- if proved -- are actionable as securities fraud. The instant case is strikingly similar to *Seippel*. In *Seippel*, the plaintiff alleged that the defendants took advantage of their knowledge of the plaintiff's plan to exercise stock options in order to induce the plaintiff into participating in a COBRA Strategy. 341 F. Supp. 2d at 373-75. The court determined that these allegations were not actionable under the federal RICO statute because the transaction was "in connection with" the plaintiffs' sale of stock:

> There is no question here that defendants' alleged scheme, which dates back to 1996, coincided temporally with the sale of Mr. Seippel's stock. The Seippels have alleged that defendants were engaged in a fraudulent scheme before, during and after the stock transaction. The stock transaction was integrally related to the fraudulent scheme.

> Defendants contacted the Seippels, as part of their scheme, precisely because of his sale of stock, and took advantage of their knowledge of Mr. Seippel's planned securities transaction to induce him to take part in the COBRA transaction.

*Id*. at 374.

Similarly, the stock transactions in the present case were integrally related to the alleged fraudulent scheme. Here, as in *Seippel*, the plaintiffs maintain that the defendants approached several plaintiffs to induce them to enter into the COBRA Strategy because the defendants allegedly knew that those plaintiffs expected to incur a substantial capital gain from the sale of stock or the exercise of stock options. *See* Complaint ¶¶ 81, 90, 95, 98, 101, 104, 115, 117, 122. In particular, the Anderson and Griffith plaintiffs allege they participated in the COBRA Strategy to offset substantial gains they expected to realize from the sale of stock. See *id*. ¶¶ 81, 89-90. The Griffith plaintiffs further allege that the Lincoln defendants aggressively pressured them "to sell as much stock as they could because the Strategy might not be available in later years 'due to possible law changes'" and they told the Griffiths "that they could not do the transaction for less than a $5 million income offset." *Id*. ¶ 90.

The plaintiffs attempt to distinguish *Seippel* on the ground that the plaintiff there was approached about the COBRA Strategy because of a large future sale of stock. *See* Plaintiffs' Consolidated Response at 13-15. The plaintiffs claim that were

it not for the defendants in *Seippel*, there would have been no sale of stock. *Id.* at 14. Since some of the plaintiffs in this case were approached *after* they had realized a gain -- specifically, the Davis plaintiffs, Avneri plaintiffs, Dusansky plaintiffs, and Overturf plaintiffs -- these plaintiffs contend that the reasoning in *Seippel* should not apply to them. *Id.* at 13; *see also* Complaint ¶¶ 78-80, 106, 111, 129.  Thus -- these plaintiffs argue -- at least with respect to themselves, there was no possible contemporaneous securities transaction around which the defendants' scheme could have been predicated.  Plaintiffs' Consolidated Response at 13.  This argument, however, is unpersuasive.  In this case, as in *Seippel*, the goal was to avoid paying taxes on gains realized from the sale of stock or other assets.  Whether the gains accrued to the individual plaintiffs before or after they participated in the COBRA Strategy has no effect on whether the COBRA Strategy is actionable as securities fraud.

There can be no doubt that the defendants' alleged scheme, which dates back to 1999, coincided temporally with the sale of securities.  Based on the allegations of the plaintiffs in their complaint, the sale of the securities was clearly central to the intended result of the COBRA Strategy.  Indeed, without the sale of the stock, there would have been no need for a tax loss to offset their capital gains.[18]  The defendants

---

[18]      See *Swartz v. KPMG, LLC, et al.*, No. C03-1252P, slip op. at 3-4 (W.D. Wa. Feb. 13, 2004), *attached to* Affidavit of Mike Stenglein ("Stenglein Affidavit") at 8-25 (holding that the alleged fraud was in connection with the sale of securities and within the purview of the PSLRA where the sale of securities was clearly central to the intended result because without the sale of stock there would have been no need for a
(continued...)

contacted the plaintiffs, as part of their scheme, precisely because of their sale of

stock, and took advantage of their knowledge of the plaintiffs' planned securities

transaction to induce them to take part in the COBRA Strategy.  As in *Zanford*, "[t]he

securities sales and [defendants'] fraudulent practices were not independent events."

*Zanford*, 535 U.S. at 820.  The plaintiffs' attempt to persuade the court that the

PSLRA is inapplicable to the transaction because the sale of the stock was somehow

an incidental attribute of the fraud, *see* Plaintiffs' Consolidated Response at 11, 14, is

unconvincing.  To the contrary, it is clear that the alleged fraud was "in connection

with" the sale of securities and thus within the purview of Rule 10b-5 and the PSLRA

bar.

Since these allegations are actionable as securities fraud, the plaintiffs cannot

rely on them as the basis for a RICO claim.[19]  Moreover, because the plaintiffs have

not pleaded a RICO violation on which relief can be granted, their RICO conspiracy

claims must also fail.  *See* 18 U.S.C. § 1962(d) (requiring an underlying RICO

violation to support a conspiracy claim); see also *Manax v. McNamara*, 842 F.2d 808,

812 (5th Cir. 1988) (holding that a claim under 18 U.S.C. § 1962(d) fails where

allegation are insufficient to establish a violation under 1962(c)); *Murphy v. Grisaffi*,

---

[18](...continued)
tax loss to offset the plaintiff's capital gains).

[19]     As the PSLRA bar disposes of the plaintiffs' RICO claims, there is no
need to rule on whether the plaintiffs properly alleged each element of a RICO claim.
See *Seippel*, 341 F. Supp. 2d at 374 n.70.

No. Civ. A. 3:04-CV-0134-B, 2005 WL 598015, at *6 (N.D. Tex. Mar. 14, 2005)

(same). The plaintiffs' RICO claims are therefore dismissed.

### C. The Plaintiffs' State Law Claims

Federal court jurisdiction exists over an entire action, including state law

claims, when the federal and state law claims "'derive from a common nucleus of

operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try

them all in one judicial proceeding.'" *Carnegie-Mellon University v. Cohill*, 484 U.S.

343, 349 (1988) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725

(1966)). Yet, supplemental jurisdiction over state law claims "is a doctrine of

discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726. Consequently, "a federal

court should consider and weigh in each case, and at every stage of the litigation, the

values of judicial economy, convenience, fairness, and comity in order to decide

whether to exercise jurisdiction over a case brought in that court involving pendent

state-law claims." *Carnegie-Mellon*, 484 U.S. at 350.

When the federal claims are dismissed before trial and only state law claims

remain, the balance of factors to be considered under the supplemental jurisdiction

weighs heavily in favor of declining jurisdiction; therefore, the federal court should

usually decline the exercise of jurisdiction over the remaining claims and send them to

state court. See *id*. n.7. According to the Fifth Circuit, "[o]ur general rule is to

dismiss state claims when the federal claims to which they are pendent are

dismissed." *Parker & Parsley Petroleum Company v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)).

Here, the federal claims against all of the defendants have been dismissed and only the state law claims remain. Although this case has been in this court for almost one year, there is no trial setting as yet and no scheduling order has been entered. See *Carnegie-Mellon*, 484 U.S. at 351 (recognizing that a district court has a "powerful reason" to decline jurisdiction when the single federal claim is eliminated early on in the litigation). Because the federal claims are being dismissed before trial, the factors of judicial economy, convenience, fairness, and comity suggest that this court ought to decline jurisdiction over the remaining state law claims against these defendants.[20] *See* 28 U.S.C. § 1367(c)(3). Those claims are therefore dismissed without prejudice.

## III. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss is **GRANTED** and the plaintiffs' RICO claims are **DISMISSED**. Since the court has dismissed the only federal cause of action, the court declines to exercise supplemental jurisdiction

---

[20]    Given the PSLRA's prohibition against basing RICO claims on securities violations, the plaintiffs should have been aware of the consequences of advancing such a claim under the facts of this case. The plaintiffs "must have realized that the jurisdiction [they] invoked was pendent and possibly tentative." *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994). As a result, the plaintiffs "knowingly risked dismissal of [their] pendant claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power." *Annulli v. Panikkar*, 200 F.3d 189, 202-03 (3d Cir. 1999), abrogated on other grounds by *Rotella v. Wood*, 528 U.S. 549 (2000).

over the remaining state law claims and the plaintiffs' state law claims are

**DISMISSED** without prejudice.[21]

       **SO ORDERED**.

June 6, 2005.

                                     _____

                                     A. JOE FISH
                                     CHIEF JUDGE

---

[21]      In view of this disposition, the motion of the BDO defendants to compel arbitration is **DENIED** as moot.